UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>GEORGE R. MCKOWN, )<br>)<br>Defendant. ) | Cause No. 2:16-CR-178-PPS-JEM |

## OPINION AND ORDER

George R. McKown, a former licensed insurance agent, operated an insurance business called McKown & Associates in Indiana. [DE 338 at ¶5.] Beginning in 2008, McKown and his associate Richard Gearhart, also an insurance agent, pitched to their insurance clients the sale of unregistered securities from Asset Preservation Specialists ("APS"), a shared company they controlled. [*Id*.] McKown and Gearhart promised safe and stable returns of six to eight percent and assured clients they could obtain a full return of their initial investment at any time. [*Id*. at ¶6.] They even sent corporate notes from APS to investors signed by Gearhart (as CEO) and McKown (as President). [*Id*.]

As persuasively established by the government at trial, the whole endeavor was a scam. McKown and Gearhart preyed on the elderly (the victims ranged from 60 to 90 years old at the time of their initial purchase) in the sale of these "investments." [*Id*. at ¶9.] McKown and Gearhart told most APS investors that their money would be pooled together and invested in the market. [*Id*. at ¶10.] Instead, McKown and Gearhart funneled the investor money to companies and side projects in which McKown and

Gearhart had an interest. [*Id.*] In most cases, the transfers were made without any agreement that dictated what the money was to be used for or how APS would be paid back. [*Id.*] McKown and Gearhart did not disclose the true use of the APS funds to its investors, and they paid little back to APS from the transfers. [*Id.*] By late 2012, almost all the money invested in APS had been lost, and the elderly victims (or their heirs) were left holding the bag. [*Id.*]

Co-defendant Richard Gearhart pleaded guilty to conspiracy to commit securities fraud. McKown opted for trial at which he was represented by a court appointed attorney, Professor Richard Kling. After a five-day trial, a jury convicted McKown on October 29, 2021, of one count of Conspiracy to Commit Securities Fraud, in violation of 18 U.S.C. § 371, and one count of Wire Fraud, in violation of 18 U.S.C. § 1343. [DE 298; DE 304.] I sentenced McKown on May 20, 2022, to a cumulative 84 months of incarceration, two years of supervised release, over five million in restitution, and over one million in a money judgment forfeiture. [DE 356; DE 358.]

McKown appealed, [DE 360], and the Seventh Circuit appointed new lawyers to prosecute his appeal. But for reasons that are not particularly clear, McKown got cross ways with these new appellate lawyers, and he asked the Seventh Circuit to dismiss them and to order the brief they had filed on his behalf withdrawn. The Seventh Circuit granted McKown's request but despite several *sua sponte* extensions of his deadline to file a new brief, McKown never filed one. The Seventh Circuit eventually dismissed his appeal for lack of prosecution on July 19, 2023. [DE 379.]

McKown filed a timely[1] *pro se* motion to vacate his conviction and sentence under 28 U.S.C. § 2255 that he supplemented with two additional filings. [DE 383; DE 385; DE 391.] McKown alleges he was denied due process in two ways: by an unfair grand jury proceeding and by an unfair trial. He also claims to have received ineffective assistance of counsel. Per the Court's direction, [DE 392], the government responded to McKown's three collective motions with one response. [DE 393.] After McKown filed his reply, the motion became ripe for my review. [DE 398.] For the reasons explained below, McKown's motions are denied.

## Legal Standard

Section 2255(a) allows a prisoner who has been sentenced to return to the court in which he was convicted and request his release on the grounds that his sentence "was imposed in violation of the Constitution or laws of the United States." 28 U.S.C. § 2255(a). A petitioner seeking relief under § 2255 faces a tall order. Indeed, such relief is only available "in extraordinary situations, such as an error of constitutional or jurisdictional magnitude or where a fundamental defect has occurred which results in a complete miscarriage of justice." *Harris v. United States*, 13 F.4th 623, 627 (7th Cir. 2021) (quoting *United States v. Coleman*, 763 F.3d 706, 708 (7th Cir. 2014)); *see also Coleman v. United States*, 79 F.4th 822, 826 (7th Cir. 2023) (describing relief under § 2255 as an "extraordinary remedy and therefore only available in limited circumstances") (citation omitted).

---

[1] Though docketed on July 25, 2024, the government does not contest McKown's representation that he placed his initial motion in the mail by July 19, 2024. [DE 393 at 3 n.3.]

## Discussion

**I.     Due Process Claims**

Let's begin with McKown's due process claims. He alleges government witnesses deprived him of his due process rights in both the grand jury proceedings and at trial. The government argues that McKown has procedurally defaulted these claims because McKown did not raise them on his direct appeal to the Seventh Circuit.

"The failure to raise an issue on direct appeal generally bars a defendant from raising it later in a post-conviction proceeding." *Barker v. United States*, 7 F.3d 629, 632 (7th Cir. 1993). There is an exception to this rule "if the defendant can demonstrate cause for the procedural default as well as actual prejudice from the failure to appeal." *Id*. Another exception to that general rule are claims of ineffective assistance of counsel. While they can be brought on direct appeal, the Seventh Circuit has repeatedly stated that they are better raised in a habeas proceeding so that a full record can be made. *See United States v. Flores*, 739 F.3d 337, 341–42 (7th Cir. 2014) (collecting cases and noting "we have said many times that it is imprudent to present an ineffective-assistance argument on direct appeal"); *see also Massaro v. United States*, 538 U.S. 500, 504 (2003). I'll return to the ineffective assistance of counsel claim in a moment.

McKown's appellate counsel filed a brief in his direct appeal on October 27, 2022. [*See* Case No. 22-1974, Doc. 13.] He raised six issues: (1) the government's security law expert's opinion was improper; (2) the jury instructions were erroneous; (3) the lay opinion testimony from APS investors concerning whether McKown deceived them constituted plain error; (4) the government's summary charts were erroneously

4

admitted as evidence; (5) the extensive, prejudicial evidence of victim loss constituted plain error; and (6) the cumulative effect of the aforementioned errors warranted a new trial. McKown did not raise a due process claim concerning supposed perjured government testimony at trial or during grand jury proceedings.

However, in a November 22, 2022, letter to the Seventh Circuit, McKown claimed his attorneys filed his direct appeal without any input from him. [*See* Case No. 22-1974, Doc. 19.] His attorneys did not respond to McKown's claim and joined his call to terminate their representation of McKown. [*See* Case No. 22-1974, Doc. 21.] The Seventh Circuit then directed McKown to inform the court whether he intended to pursue his appeal *pro se* or retain new counsel. [*See* Case No. 22-1974, Doc. 22.] McKown responded by asking the Circuit to withdraw the appellate brief his attorneys filed. [*See* Case No. 22-1974, Doc. 23.] The Circuit granted McKown's request and directed him to file a new brief. [*See* Case No. 22-1974, Doc. 26.] After numerous missed deadlines, the Circuit dismissed McKown's appeal for lack of prosecution because he failed to file a new brief. [*See* Case No. 22-1974, Doc. 31.]

McKown's lengthy reply brief provides no response to the government's argument that his due process claims are procedurally defaulted. In fact, McKown's second § 2255 motion plainly states: "None of the 3 grounds in this motion have been presented previously. I did not do a direct appeal therefore this is the first opportunity." [DE 385 at 9] (cleaned up). Recall that to avoid procedural default of these due process arguments, McKown must identify cause and actual prejudice. *Barker*, 7 F.3d at 632. The Seventh Circuit has defined cause as "some impediment to making an argument."

5

*Turner v. United States*, 693 F.3d 756, 758 (7th Cir. 2012). McKown provides no cause for why he did not heed the Seventh Circuit's repeated warnings to file a renewed appellate brief that included these due process arguments after his counsels' dismissal. Therefore, in the absence of an explanation for why McKown did not raise the due process claims before the Seventh Circuit on a direct appeal, they are now procedurally defaulted. *See Torzala v. United States*, 545 F.3d 517, 522 (7th Cir. 2008) (procedural default applies when a defendant "fail[s] to take a direct appeal . . . .")

## II.     Ineffective Assistance of Counsel Claim

McKown's next claim is that his trial counsel was ineffective. The Sixth Amendment to the United States Constitution guarantees a criminal defendant the assistance of counsel for his defense. U.S. Const. amend. VI. Here, McKown is requesting relief under § 2255 claiming that he was denied his Sixth Amendment right to the effective assistance of counsel. When reviewing a § 2255 motion claiming ineffective assistance of counsel, I evaluate the claim using the two-prong test established in *Strickland v. Washington*, 466 U.S. 668 (1984). *McDowell v. Kingston*, 497 F.3d 757, 761 (7th Cir. 2007) ("Generally, claims of ineffective assistance of counsel are evaluated under a two-prong analysis announced in *Strickland*.").

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686. Under *Strickland*, a claimant must prove (1) that his attorney's performance fell below an objective standard of reasonableness and (2) that the attorney's deficient

performance prejudiced the defendant. *McDowell*, 497 F.3d at 761. If the petitioner fails to illustrate that either prong of the test is satisfied, there is no need for me to evaluate the other prong. *Ebbole v. United States*, 8 F.3d 530, 533 (7th Cir. 1993) ("A defendant's failure to satisfy either prong is fatal to his claim.").

When considering the first prong of *Strickland* — attorney performance — I am required to take a deferential approach with respect to the decisions the attorney made with the underlying assumption being that counsel's conduct falls within the wide range of reasonable professional assistance. *See United States v. Holman*, 314 F.3d 837, 840 (7th Cir. 2002). "Counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Jordan v. Hepp*, 831 F.3d 837, 846 (7th Cir. 2016) (quoting *Strickland*, 466 U.S. at 690). For me to decide that counsel's representation was inadequate, counsel's representation must have fallen "below an objective standard of reasonableness." *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (citation omitted). Making a showing that counsel's representation was constitutionally inadequate is a steep hill to climb. *See Jordan*, 831 F.3d at 846.

As for the second prong, to make a showing that counsel's inadequate representation led to prejudice, a defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Lee v. Galloway*, 106 F.4th 668, 673 (7th Cir. 2024) (quoting *Strickland*, 466 U.S. at 694). "It is not enough to show that the errors had some conceivable effect on the outcome of the proceeding." *Gilbreath v. Winkleski*, 21 F.4th 965, 989 (7th Cir. 2021)

7

(citation omitted). Instead, counsel's conduct must have "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *United States v. Hise*, 65 F.4th 905, 909 (7th Cir. 2023) (citation omitted).

McKown does not clearly articulate his theory of his trial counsel's alleged deficient performance in the morass of his three § 2255 motions. McKown's first § 2255 motion contains virtually no reference to ineffective assistance of counsel. He includes only one passing allegation that his attorney failed to use a document McKown provided during trial. [DE 383 at 16.] The rest of McKown's first motion relitigates the evidence presented at trial.

McKown's second motion, weighing in at 76 pages, provides scant additional detail to support his ineffective assistance of counsel claim. This time, McKown provides a completed version of a § 2255 form that he supplements with 62 pages of additional explanation. [*See* DE 385; DE 385-1.] But despite its heft, the supplemental explanation does not flesh out his ineffective assistance of counsel claim. His completed § 2255 form provides only a high-level overview of his theory that his trial counsel "did not present sufficient material evidence" and did not subject government witnesses to sufficient adversarial testing. [*See* DE 385 at 6–7.] Then, in his third § 2255 motion McKown includes another completed § 2255 form that asserts a near identical high-level ineffective assistance of counsel claim. [DE 391 at 9–10.]

It is only in his 61-page reply brief to the government's consolidated response that McKown adds detail to his ineffective assistance of counsel claim against his trial

8

attorney, Richard S. Kling. [*See* DE 398.] McKown's reply brief was not the proper place to add color to his ineffective assistance of counsel claim for the first time. As has been stated literally hundreds of times by various courts, arguments first raised in a reply brief are ordinarily waived. *See, e.g., White v. United States*, 8 F.4th 547, 552 (7th Cir. 2021). This is for the obvious reason that proceeding in such a manner leaves the opposing party "no chance to respond." *Id*. It is particularly galling here where McKown filed what is effectively *three* § 2255 motions. But given the importance of ineffective assistance of counsel claims and the fact that they are not waived on direct appeal, *Massaro*, 538 U.S. at 504, I will analyze McKown's arguments on the merits.

McKown's long list of ineffective assistance of counsel allegations reads more like a list of personal grievances and affronts than a cogent legal theory of how Mr. Kling provided constitutionally ineffective assistance of counsel. Accordingly, many of McKown's arguments are, to be frank about it, a bit half-baked. As the government notes in response, perfunctory and underdeveloped arguments unsupported by legal authority are waived. *Hess v. Kanoski & Assocs.*, 668 F.3d 446, 455 (7th Cir. 2012). Despite this, I will try my best to parse and analyze each of McKown's arguments.

McKown first claims that at an early status hearing, an Assistant U.S. Attorney told the then presiding judge (Judge Van Bokkelen) that McKown planned to testify against his co-defendant Richard Gearhart. [DE 398 at 26.] McKown claims that Kling sat back and said nothing despite the fact that McKown had never planned to testify against Gearhart, let alone plead guilty. [*Id*.] Though he does not provide a date for this status conference, McKown appeared before Judge Van Bokkelen only one time on

9

March 8, 2019. [DE 82.] McKown's case was shortly thereafter transferred to Judge Springmann on November 15, 2019 (and then later on to me). [DE 99.] Assuming the exchange occurred on this date, it is entirely unclear how this threadbare allegation could have possibly prejudiced the outcome of McKown's trial.

Next, McKown says Kling did not tell him the purpose, and inherent risks, of sitting for two proffers with the government. [DE 398 at 26.] These proffers occurred on November 28 and December 19, 2017. [DE 271 at 1.] He says Kling told him not to "defend [his] actions" and to be careful with what he told the government because they could later use it against McKown. [DE 398 at 26.] Despite his counsel's warning, McKown says he told Kling he was going to "tell the truth without any reservation." [*Id*.] It was not until after the second proffer, McKown tells me, that he learned he was "testifying against [himself] as well as Gearhart." [*Id*. at 27.] McKown says neither his counsel nor the government informed him of this possibility. [*Id*.]

McKown's proffer allegation is contradictory. McKown's claim that Kling never told him that McKown's comments in his proffer could serve as testimony against himself flies in the face of his comment that Kling told him to "be careful what I said and that they could use it against me later." [*See id*. at 26.] More importantly, McKown fails to explain how his providing a proffer to the government impacted his trial. He says the government used the proffers to "fill in the blanks on how I, along with Gearhart, had operated the scheme for which we were being accused." [*Id*. at 27.] However, the government did not use McKown's proffer testimony to impeach him when he chose to take the stand on the fourth day of his trial on October 28, 2021. [*See*

10

DE 327.] In fact, McKown does not point to a single use of his proffer testimony at trial to support his theory. In sum, even if I were of the mind to think Kling somehow provided constitutionally inadequate assistance relating to the proffer (and I'm not), I'm at a loss to see how McKown was prejudiced by Kling's advice. The evidence shows that McKown knew the risks of sitting for two proffers with the government and of testifying in his own defense. He chose to proceed with both options anyway, and he provides no theory for how his proffer testimony impacted his case at trial. In other words, there was no prejudice to McKown.

McKown also claims Kling failed to call attention to the purported disparity in the number of entries on the checking account associated with APS that were tied to McKown as opposed to his co-defendant Gearhart. [DE 398 at 27.] McKown says Kling "barely mentioned" this disparity and "mailed in" McKown's defense. [*Id.*] The trial record does not support this naked assertion. During trial, Kling questioned the government's witness Mary Johnson (the case agent) about the bank records of APS's expenditures. Johnson admitted McKown could neither deposit nor withdraw money from the APS account. [DE 326 at 54.] Kling also highlighted the hundreds of purported suspicious entries on APS's account record that were tied to Gearhart alone. [*Id.* at 59–60.] In other words, the record flatly contradicts McKown's claim that Kling never raised the issue about his relative lack of involvement compared with his co-defendant Gearhart. Kling certainly did highlight this fact.

What's more, in his closing argument, Kling returned to that theme—that the overwhelming majority of the evidence tied Gearhart, and not McKown, to the scheme

11

to defraud. Kling argued the government had not produced "one piece of paper . . . showing here is the bank account that George McKown" used to receive money from the alleged fraud. [DE 328 at 41.] Kling noted that the thousands of entries in APS's bank account, an account Kling said McKown did not have access to, were all tied to Gearhart and not McKown. [*Id.* at 42–43.] He reiterated that approximately $20,000 of the millions of APS expenses in question that related to McKown were tied to legitimate business expenses such as rent. [*Id.* at 45.] Kling explored the theory that Gearhart controlled APS and McKown did not participate in the expenditures from APS's account at length during trial and hammered home this theme in closing. Ultimately, this argument did not carry the day with the jury. McKown has not demonstrated constitutionally deficient performance by Kling in advancing this argument. Indeed, a review of the record shows quite the contrary; Kling fought hard during the trial to deflect attention away from his client and onto his co-defendant Gearhart. The fact that he was ultimately unsuccessful is, on its own, not a basis to show that Kling was constitutionally ineffective. *See Harrington v. Richter*, 562 U.S. 86, 105 (2011) ("It is 'all too tempting' to 'second-guess counsel's assistance after conviction or adverse sentence.'") (quoting *Strickland*, 466 U.S. at 689).

     McKown also claims Kling failed to raise certain issues pretrial with the government about who owned the corporate entities which were the subject of the scheme to defraud. [DE 398 at 27–28.] McKown makes the astonishing claim that had Kling done so, the government would have folded up its tent, dismissed the case, and apologized to McKown for his troubles. The argument is outlandish. McKown provides

12

little argument or evidence to support this speculation. At trial, Kling questioned McKown about his involvement in United Northwest Securities. McKown said he had no authority to withdraw or deposit money from that entity, which Gearhart controlled. [DE 327 at 60–61.] Kling asked McKown about Recalibrate, which McKown said Stephen Bolt and Gearhart were involved with. [*Id.* at 74–75.] As for E-Applied Data, McKown testified that he became involved with the company's business mission. [*Id.* at 73–74.] Upon questioning by Kling, McKown also discussed Ashton Garnett Securities, Inc. [*id.* at 59], his involvement in Vantage Advisors beginning in March 2009 [*id.* at 57], and Praxiant [*id.* at 75], the last of which McKown testified was his company. The trial record shows Kling asked McKown to testify as to the formation, purpose, and McKown's involvement in each of the entities that McKown claims Kling did not sufficiently raise with the government.

As for Praxiant, McKown argues Kling never discussed or brought up in McKown's direct testimony three interest payments Praxiant allegedly made on a loan from APS. [DE 398 at 28.] Once the government raised this point on cross-examination, Kling discussed it with McKown on re-direct. [DE 327 at 142.] McKown testified that there was no written note of the purported loan from APS to Praxiant and, accordingly, no documentation of the interest rate or re-payment schedule for the loan. [*Id.* at 143.] But once again, besides the conclusory statement that this was a "very important point that needed to be made and emphasized", [DE 398 at 28], McKown does not explain the significance of why exploring these purported interest payments from Praxiant on re-direct examination instead of on his direct examination prejudiced him at trial.

13

McKown also argues Kling failed to subpoena or sufficiently question key alibi witnesses. Claiming an alibi for a fraud scheme that covered several years is absurd on its face. Nevertheless, McKown first takes issue with Kling's failure to subpoena Jason McKenna, Gearhart's son. [DE 398 at 30.] According to McKown, Kling spoke with McKenna's attorney, who said McKenna would not talk. McKown said Kling should have called McKenna as a witness anyway so that he was forced to "take the 5th." [*Id.*] There are two problems with this logic. First, McKown says McKenna's testimony "would be important to confirming my story." [*Id.*] But if McKenna invoked his Fifth Amendment right not to testify, as McKown says he would have, then McKenna would have provided no substantive exculpatory testimony in McKown's defense. Second, to the extent McKown argues McKenna invoking his Fifth Amendment rights would have somehow bolstered his theory that Gearhart was solely responsible for the criminal scheme, this too is nonsensical. McKenna was not a defendant in this case, and the Court does not understand how McKenna's testimony would have relieved McKown of his role in this offense. This is yet another example of "the distorting effects of hindsight", *Strickland*, 466 U.S. at 689, which is the improper way to analyze ineffective assistance of counsel claims. I find no prejudice here.

McKown next takes issue with Kling's questioning of Steve Lawson. Kling called Lawson as a witness on the fourth day of trial. Lawson testified that he developed APS in approximately 2008. [DE 327 at 6.] Lawson testified that Gearhart purchased APS from him in 2008 or 2009. [*Id.* at 10.] Kling asked whether, at the time he sold APS to Gearhart, McKown was "in any way, shape, or form involved with APS." [*Id.*] Lawson

14

said "no." [*Id.* at 11.] Kling's questioning of Lawson was indeed brief. McKown claims Kling failed to solicit testimony from Lawson that McKown was not an officer or owner of APS. [DE 398 at 30.] While Kling may not have questioned Lawson for a length of time on this point to McKown's liking, Kling did solicit testimony from Lawson on the most salient point: that McKown was not involved with APS at the time of the sale to Gearhart. Further questioning on this point would likely have shown that Lawson has no personal knowledge of who was involved in APS after he sold the business. This kind of questioning would have only raised suspicion. So, Kling made the wise decision of saying less than more. And in any event, these kinds of "[t]rial tactics are a matter of professional judgment, and we will not play Monday morning quarterback when reviewing claims that an attorney rendered constitutionally deficient representation in making decisions on how best to a handle a case." *United States v. Lathrop*, 634 F.3d 931, 937 (7th Cir. 2011) (cleaned up by omitting internal quotations and citations).

McKown next claims Kling failed to hire an expert witness on securities despite McKown's allotment of $2,000 to hire such an expert. [DE 398 at 32.] McKown provides no explanation for how a securities expert would have impacted his trial. Without such a proffer of what the testimony would have been, I cannot find prejudice here. Finally, McKown asserts a variety of claims best characterized as complaints about a breakdown in his working relationship with Kling. For example, he claims Kling "refused to accept that [McKown] was innocent", "didn't care about [McKown's] defense", called McKown stupid and ignored McKown, and was generally unprepared. [DE 398 at 26–32.] But once again, these claims are underdeveloped and contrary to the record at trial.

15

Kling participated in a five-day trial in McKown's defense that included a review of tens of thousands of pages of financial documents, and he called three witnesses (including McKown) in McKown's defense. These efforts do not meet the high hurdle of constitutionally inadequate counsel.

## Certificate of Appealability

Pursuant to Rule 11 of the Rules Governing Section 2255 Proceedings, a district court must "issue or deny a certificate of appealability when it enters a final order adverse to the applicant." A certificate of appealability may issue only if the applicant "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make such a showing, a defendant must show that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Dalton v. Battaglia*, 402 F.3d 729, 738 (7th Cir. 2005) (citation omitted). For the reasons set forth above, I find no basis for a determination that reasonable jurists would find this decision debatable or incorrect or that the issues deserve encouragement to proceed further. Therefore, a certificate of appealability will not be issued. 28 U.S.C. § 2253(c)(2). If McKown wishes to appeal this Opinion and Order, he must seek a certificate of appealability from the Court of Appeals under Federal Rule of Appellate Procedure Rule 22.

**ACCORDINGLY**:

George McKown's Motions to Vacate, Set Aside, or Correct his Sentence pursuant to 28 U.S.C. §2255 [DE 383; DE 385; DE 391] are **DENIED** and a certificate of appealability is **DENIED**.

**SO ORDERED**.

ENTERED: August 4, 2025.

                                          /s/ Philip P. Simon
                                          PHILIP P. SIMON, JUDGE
                                          UNITED STATES DISTRICT COURT